J-S39024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RONALD E. FAIRIROR | : | |
| | : | |
| Appellant | : | No. 2690 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 5, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0007875-2022

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                **FILED FEBRUARY 25, 2026**

Appellant Ronald Fairiror appeals from the judgment of sentence imposed following his convictions for first-degree murder, carrying a firearm without a license, carrying a firearm on a public street or public property in Philadelphia, and possession of an instrument of crime (PIC).[1]  On appeal, Appellant challenges the weight and sufficiency of the evidence and also argues that the Commonwealth failed to properly authenticate video evidence. After careful review, we affirm.

The trial court set forth the facts of this case as follows:

On June 4, 2022, at approximately 4 a.m., Philadelphia police officers heard multiple gunshots around the 4100 block of North Broad Street.  After hearing the gunshots, police began surveying the area and located Orane Moseley [(the victim)] lying on the ground outside of a Sunoco gas station located at 4140 North

_____

[1] 18 Pa.C.S. § 2502(a), 6106(a)(1), 6108, and 907(a), respectively.

Broad Street, suffering from gunshot wounds. When police arrived, [the victim] was in "extremely critical" condition, unable to move on his own, and bleeding heavily. Police transported [the victim] to Temple University Hospital, where he was pronounced dead fifteen days later, on June 19, 2022. [The victim] had been shot nine times in vital parts of his body. The medical examiner determined that [the victim's] cause of death was multiple gunshot wounds, and his manner of death was homicide.

While investigating [the victim's] shooting, police obtained video surveillance which showed two men and a woman pulling into the Sunoco gas station on the morning of the murder at approximately 2:20 a.m. in a silver vehicle. The men were subsequently identified as [Appellant] and his [co-defendant], Ronald Johnson [(co-defendant)]. After parking the vehicle, [Appellant] approached the attendant window at the gas station and bought chips before walking towards Club 151, located at 4128 North Broad Street. [Appellant] entered Club 151 with [co-defendant] and the unknown woman around 2:38 a.m. and was inside for approximately one hour and 15 minutes. Interior surveillance cameras at Club 151 showed that while [Appellant] was inside, [the victim] was also there, sitting at the bar. [Appellant] and [the victim] did not interact with each other while they were both inside Club 151.

[Appellant] left Club 151 with [co-defendant] and the unknown woman shortly before 4 a.m. and walked towards the Sunoco parking lot where [Appellant] had parked earlier that morning. [The victim] was nearby [Appellant], beside [the victim's] vehicle. A physical altercation ensued, involving a total of five individuals: [Appellant], [the victim], [co-defendant], the unknown woman, and a second unknown woman who appeared to be with [the victim].

After the altercation broke up, [Appellant] walked back to the silver vehicle he had arrived in, opened the passenger door, and rushed back to [the victim's] vehicle with a gun in hand. At approximately 4:01 a.m., [Appellant] walked up to the driver's side of [the victim's] vehicle and shot [the victim]. [Appellant] then raised his shirt over his head, covering his face, and left the scene on foot with [co-defendant]. [Appellant] was not licensed to carry a firearm on the date of the shooting.

Trial Ct. Op., 12/5/24, 2-4 (citations omitted).

On September 5, 2024, the jury found Appellant guilty of the above stated charges. That same day, the trial court imposed the mandatory incarceration sentence of life without parole for first degree murder[2] plus a consecutive incarceration sentence of three and a half to seven years for carrying a firearm without license; in addition to a consecutive incarceration sentence of two and a half to five years for PIC; for an aggregate incarceration sentence of life plus eight and a half to seventeen years.

Appellant filed a timely post-sentence motion on September 5, 2024. The trial court denied the motion on October 5, 2024. Appellant filed a timely notice of appeal. Both the trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant raises the following issues for review:

1. Whether the verdict was against the sufficiency of the evidence when . . . Appellant was acquitted of criminal conspiracy to commit murder; the evidence was insufficient to establish . . . Appellant shot the [victim]; insufficient to demonstrate a specific intent to kill required for conviction of murder of the first degree; and was not sufficient to demonstrate that Appellant employed an instrument of crime with the intent to use it criminally.

2. Whether the verdict was against the weight of the evidence when . . . Appellant was acquitted of criminal conspiracy to commit murder; the evidence failed to prove beyond a reasonable doubt that . . . Appellant shot the [victim] or had the specific intent to kill required of murder of the first degree; and that Appellant possessed an instrument of crime.

_____

[2] 18 Pa.C.S. § 1102(a)(1).

- 3 -

3. Whether the Commonwealth . . . failed to establish sufficient collection and chain of custody procedures for the raw video clips that were introduced at trial as a video compilation, thereby causing undue prejudice to . . . Appellant.

Appellant's Brief at 5 (some formatting altered).

## Sufficiency of the Evidence

In his first claim, Appellant argues that there was insufficient evidence to support his convictions. *See* Appellant's Brief at 11-13. Specifically, Appellant argues that the evidence was insufficient to establish that he was the individual who shot the victim or that he acted with the specific intent to kill. *See* Appellant's Brief at 13. Further, Appellant contends that if the evidence was insufficient to show he shot the victim, the evidence would be insufficient to sustain the guilty verdicts for PIC as well as for carrying a firearm without a license and carrying a firearm on a public street or public property in Philadelphia (the VUFA charges). *See id.*

When reviewing a challenge to the sufficiency of the evidence, we are governed by the following standard:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial

- 4 -

evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted and formatting altered).

To support a guilty verdict for first-degree murder, our Supreme Court has held that the Commonwealth must prove all three of the following elements beyond a reasonable doubt:

(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill.

*Commonwealth v. Jordan*, 65 A.3d 318, 323 (Pa. 2013) (citations omitted and some formatting altered); *Commonwealth v. Johnson*, 160 A.3d 127, 136 (Pa. 2017).

The governing standard regarding the sufficiency of identification evidence is well established by this Court. This Court has consistently held that "[i]n addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." *Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) (citation omitted). "Evidence of identi[ty] need not be positive and certain to sustain a conviction." *Id.* "[A]ny indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial

evidence." *Id.* (citing *Commonwealth v. Hickman*, 309 A.2d 564, 566 (Pa. 1973)); *see also Palmer*, 192 A.3d at 89. Additionally, "[c]lothing and physical characteristics may be used in tandem with other circumstantial evidence to validly establish the identity of a perpetrator." *Commonwealth v. Taylor*, 2354 EDA 2020, 2021 WL 6015856, at *4 (Pa. Super. filed Dec. 21, 2021) (unpublished mem.) (citing *Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*)).[3]

Here, the trial court addressed Appellant's sufficiency claim as follows:

[T]he video compilation presented at trial depicted three people, two men and one woman, going to Club 151 together on the morning of the shooting. One of the men was wearing a distinct white, collared shirt with marks on the shoulders. The surveillance footage showed this man and [the victim] getting into two physical altercations outside of the club. The video then captured the man in the white shirt walking towards [the victim's] car, immediately followed by a muzzle flash. Then, the surveillance footage showed the man in white manipulating a firearm.

The Commonwealth convincingly established that [Appellant] was the man in the white shirt depicted in the video. The video clearly captured the man in white's face, which looked exactly like [Appellant's] face, as he waited in line to buy chips from the Sunoco gas station, walked through Club 151, and left the club. In fact, [Appellant's] counsel referred to the man in white in the video as [Appellant] throughout cross-examination of Detective Lucke, who testified regarding the video compilation. Additionally, the surveillance video from inside Club 151 included multiple close-up stills of the man in white, including a photo of the back of the man's head, which, like [Appellant], was bald and had a unique scar.

In addition, the Commonwealth provided testimony that the firearm the man in the white shirt held in the surveillance footage,

_____

[3] *See* Pa.R.A.P. 126(b) (stating this Court may rely on unpublished decisions of this Court filed after May 1, 2019, for their persuasive value).

seen in his hand shortly after the muzzle flash, appeared to be an operable semiautomatic handgun. Specifically, testimony provided that the man in the white shirt appeared to remove the magazine from the gun and put it back, consistent with checking how many bullets are left. This is also consistent with the testimony of Officer Flagler, the Commonwealth's ballistics expert, that ten fired cartridge casings were recovered from the scene of the shooting, meaning they were likely fired from a semiautomatic pistol and not a revolver.

Officer Flagler also provided testimony that all ten fired cartridge casings recovered from the crime scene were fired from the same firearm. Additionally, the ten fired cartridge casings found at the crime scene were .40 caliber and manufactured by Smith and Wesson, which matched the caliber of a fired projectile recovered from the scene and one of the projectiles recovered from [the victim's] body. This was compelling corroboration that [Appellant] shot [the victim].

Trial Ct. Op., 12/5/24, at 6-8 (citations omitted and some formatting altered).

Following our review of the record, and viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient evidence to establish that Appellant shot the victim. *See* *Palmer*, 192 A.3d at 89.

As noted by the trial court, the Commonwealth introduced a video compilation which depicted the events before, during, and after the shooting. *See* Trial Ct. Op., 12/5/24, 6-8; *see also* Commonwealth Exhibit 16 (Video Compilation). The video compilation showed a man in a white collared shirt, with distinctive shoulder markings on it. *See* N.T., 9/4/24, at 97; Commonwealth Exhibit 16 (Video Compilation). The man in the white shirt's face was depicted multiple times in the video. *See* Commonwealth Exhibit 16 (Video Compilation). When the man in the white shirt's face appeared in the

video compilation, a close-up photograph of Appellant's face appeared on screen for comparison purposes. **See** Commonwealth Exhibit 16 (Video Compilation) at 09:09-09:14. Also, while in Club 151, the surveillance video captured a clear view of the back of the man in the white shirt's bald head, which featured a "distinct scar." **See** N.T., 9/4/24, at 101-103; Commonwealth Exhibit 16 (Video Compilation) at 09:30-09:35.

Because the compilation video showed clear images of the man in the white shirt's face and the jury was able to compare those images to Appellant as he sat in the courtroom and in photographs presented by the Commonwealth, the jury was free to determine whether Appellant was the man in the white shirt and we will not usurp the province of the jury. **See Commonwealth v. Childs**, 63 A.3d 323, 327 (Pa. Super. 2013) (concluding that the factfinder "was shown the surveillance video that served to identify [the defendant] and was able to draw its own conclusions" (some formatting altered)); **Commonwealth v. Harris**, 884 A.2d 920, 933 (Pa. Super. 2005) (stating that the "jury was in an adequate position to determine whether the video image of [the defendant] was []recognizable"); **see also Commonwealth v. Russell**, 800 WDA 2024, 2025 WL 1091553, at *10 (Pa. Super. Apr. 9, 2025) (explaining that "[t]he jury was free to determine, based on its viewing of the [v]ideo (on repeated occasions), as well as its observation of Appellant in court, that Appellant was the man depicted in the [v]ideo holding a gun"). Accordingly, we agree that the Commonwealth presented

sufficient evidence showing that Appellant was the man in the distinctive white shirt.

Additionally, we agree with the trial court that the Commonwealth presented sufficient evidence showing that Appellant shot the victim. The video showed Appellant arrive at the gas station and, later, Club 151 with co-defendant and an unknown woman dressed in a brown tracksuit. *See* Commonwealth Exhibit 16 at 02:00-08:50. After Appellant, co-defendant, the unknown woman, and the victim left Club 151, the video depicted Appellant engaging in a physical altercation with the victim. N.T., 9/4/24, at 106-107; Commonwealth Exhibit 16 (Video Compilation) at 08:55-17:00. During the physical altercation, both co-defendant and the unknown woman in the brown tracksuit attempted to break up the altercation multiple times. *See* Commonwealth Exhibit 16 (Video Compilation) at 15:00-17:35. The video showed that, as the physical altercation concluded, the unknown woman pushed Appellant back towards his vehicle as Appellant continued to face in the victim's direction. *Id.* at 17:17-17:35. The unknown woman pushed Appellant back to where his vehicle was parked. *Id.* at 17:30-17:35. A few seconds later, the video showed Appellant walking towards the victim, coming from the immediate proximity of the opened, front passenger door of Appellant's vehicle with a dark colored object in his hand. *Id.* at 17:35-17:58.

As Appellant approached the victim, the unknown woman's demeanor changed from earlier in the video when she attempted to break up the physical altercation. *See id.* at 17:35-17:52. The woman became more physical with

- 9 -

Appellant by trying to pull him back from returning to the victim's location and by attempting to take something out of Appellant's hands to no avail. *See id.* The video then showed Appellant separate from the unknown woman, and he closed the distance between himself and the victim with the unknown woman trailing closely behind Appellant. *See id.* at 18:23-18:37. Once Appellant was within the victim's immediate proximity, the video depicts a muzzle flash. *Id.* at 19:20-19:35.

Immediately following the shooting, video footage from a nearby surveillance camera a short distance from the victim's location, showed Appellant holding a semi-automatic handgun and removing the magazine. *Id.* at 20:32-20:56. The video then showed Appellant returning towards the shooting location, still holding the firearm in his right hand, but this time with his shirt pulled over his head, covering his face. *Id.* at 21:38-21:45.

After a careful review of the record, we agree that the Commonwealth presented sufficient evidence showing that Appellant was responsible for the killing. As demonstrated above, the video compilation provides sufficient evidence to allow the jury to conclude that Appellant shot the victim. The compilation video showed Appellant engaged in a physical altercation with the victim. After the two men were separated and the initial altercation was over, the video depicted Appellant retrieving a dark object from his vehicle. Once the item was retrieved, the video showed that the demeanor of Appellant's associate, the unknown woman, changed significantly. The video then showed Appellant approaching the victim and, as Appellant was in close proximity to

- 10 -

the victim, thereafter a muzzle flash occurred. Immediately after the shooting, the video showed Appellant with a firearm in his hand. Testimony at trial established that the firearm in Appellant's hand was a semi-automatic handgun, which was consistent with the murder weapon based on the ten fired cartridge casing recovered at the scene. *See* N.T., 9/4/24, at 26-34. Additionally, the video compilation depicted Appellant covering his face following the shooting. *See Commonwealth v. Spotz*, 870 A.2d 822, 825 n.10 (Pa. 2005) (stating "[e]vidence of a defendant's flight and/or concealment following a crime is admissible to establish an inference of consciousness of guilt" (citation omitted)). Accordingly, we agree with the trial court that the Commonwealth presented sufficient evidence to show Appellant was responsible for the killing of the victim.[4] *See Palmer*, 192 A.3d at 89.

Appellant also argues that the Commonwealth failed to provide sufficient evidence establishing that he acted with specific intent to kill. *See* Appellant's Brief at 13.

Our Supreme Court has explained specific intent to kill as follows:

_____

[4] We note that Appellant argues that the evidence was insufficient to convict him of PIC or the VUFA charges because the Commonwealth failed to establish his identity as the shooter. *See* Appellant's Brief at 13. Having concluded that the evidence was sufficient to establish that the Appellant shot the victim, we necessarily conclude that the Appellant carried and used a firearm in the shooting. Accordingly, the evidence presented at trial was sufficient to convict Appellant of PIC and the VUFA charges. *See Palmer*, 192 A.3d at 89.

As set forth in the third element, first-degree murder is an intentional killing, *i.e.*, a willful, deliberate and premeditated killing. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death. The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury.

*Commonwealth v. Jordan*, 65 A.3d 318, 323 (Pa. 2013) (citations omitted and some formatting altered); *see also Commonwealth v. Galvin*, 985 A.2d 783, 790 (Pa. 2009) (finding that use of firearm on victim's head demonstrated specific intent to kill); *Commonwealth v. Houser*, 18 A.3d 1128, 1134 (Pa. 2011) (explaining that use of firearm on victim's abdomen demonstrated specific intent to kill). Further, our Supreme Court has held that the specific intent to kill can be inferred "from the manner in which the homicide was committed, such as, multiple gunshot wounds." *Commonwealth v. Hughes*, 865 A.2d 761, 793 (Pa. 2004); *see also Commonwealth v. Kennedy*, 151 A.3d 1117, 1122 (Pa. Super. 2016) (stating it is well established that "a jury may properly infer malice and specific intent from the fact that a victim was shot multiple times").

Following our review of the record, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence presented at trial was sufficient to establish that Appellant acted with the specific intent to kill. *See Palmer*, 192 A.3d at 89.

As the trial court noted:

- 12 -

the medical examiner's testimony established that [the victim's] cause of death was multiple gunshot wounds. Specifically, the medical examiner testified that [the victim] was shot a total of nine times, including one shot to the head and four shots to the abdomen. Together, these gunshot wounds injured the frontal cortex of his brain and one of the major blood vessels in his abdomen, causing significant blood loss and impairment of the movement of his body. Moreover, the evidence . . . established that [Appellant] . . . shot the victim, with [Appellant] personally firing at least 10 shots from his semiautomatic handgun.

Trial Ct. Op., 12/5/24, at 9 (citations omitted).

Here, the medical examiner testified that the victim died due to multiple gunshots from a semiautomatic handgun, which struck the victim in vital parts of his body. *See* N.T., 9/4/24, at 165-168 (reflecting that the medical examiner testified that the victim was shot in the head and abdomen). Under these circumstances, the jury may infer that Appellant acted with specific intent to kill. *See, e.g.*, *Hughes*, 865 A.2d at 793; *see also Jordan*, 65 A.3d at 323; *Galvin*, 985 A.2d at 790; *Houser*, 18 A.3d at 1134. Accordingly, we conclude that there was sufficient evidence demonstrating that Appellant acted with the specific intent to kill. *See Palmer*, 192 A.3d at 89. Therefore, Appellant is not entitled to relief.[5]

_____

[5] In his appellate brief argument on the sufficiency claim, Appellant states "[t]he jury found [him] not guilty of the conspiracy charge." Appellant's Brief at 13 (some formatting altered). To the extent that Appellant seeks to argue that he could not be guilty of first-degree murder because of his acquittal on conspiracy, it is well established that "a court's review of the evidentiary sufficiency of a particular conviction is separate from its review of inconsistent verdicts, as sufficiency review entails an assessment of whether the evidence was sufficient for the jury to convict a defendant of a particular offense and is independent of the jury's determination that evidence on another count was

*(Footnote Continued Next Page)*

## Weight of the Evidence

Appellant also challenges the weight of the evidence. *See* Appellant's Brief at 13-15. In support, Appellant raises the exact same arguments that he relied on for his sufficiency of the evidence claim. *Compare* Appellant's Brief 11-13 *with* Appellant's Brief 13-15. Specifically, Appellant argues that the verdict was against the weight of the evidence because the Commonwealth failed to "prove beyond a reasonable doubt that . . . Appellant shot [the victim] or had the specific intent to kill required of murder of the first degree[ or that] Appellant possessed an instrument of crime." Appellant's Brief at 13 (some formatting altered).[6]

In its Rule 1925(a) opinion, the trial court concluded that although Appellant raised a weight claim, his underlying claim went to the sufficiency,

---

insufficient." *See Commonwealth v. Moore*, 103 A.3d 1240, 1242 n.3 (Pa. 2014) (citation omitted). Accordingly, because we have determined that the evidence was sufficient to sustain the verdict for first-degree murder, we need not address Appellant's argument regarding his acquittal of the conspiracy count.

[6] We note that Appellant raises the clarity of the compilation video in his appellate brief. *See* Appellant's Brief at 15 (stating that from the video, it could not be determined who shot the victim, nor that Appellant had a firearm in his hand). However, Appellant did not present this argument in his post-sentence motion. *See* Post-Sentence Mot., 9/5/24, at 1-2. Therefore, to the extent that Appellant wished to raise this argument on appeal, we find this claim waived. *See* Pa.R.A.P. 302 (stating "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); *see also Commonwealth v. Jones*, 191 A.3d 830, 834-35 (Pa. Super. 2018) (finding waiver where an appellant raised a new weight of the evidence theory on appeal that was not included in the appellant's post-sentence motion).

rather than the weight, of the evidence. *See* Trial Ct. Op., 12/5/24 at 10. We agree with the trial court's conclusion. *See Commonwealth v. Mead*, 326 A.3d 1006, 1012 (Pa. Super. 2024), *appeal denied*, 343 A.3d 985 (Pa. 2025) (stating that a weight claim that argues the evidence was insufficient to prove the elements of the offense is a sufficiency of the evidence claim and declining to address the issue separately). Therefore, Appellant is not entitled to relief. *See id.*

### Video Footage

In his third issue, Appellant argues that the trial court erred by admitting raw video footage within the compilation video because the raw footage lacked proper authentication. *See* Appellant's Brief at 15. Specifically, Appellant argues that the footage from Club 151 and the Beer Park Beer Distributor lacked documentation regarding chain of custody. *Id.* at 17. Appellant argues that the admission of that footage caused prejudice and prevented him from having a fair trial. *See id.*

Generally, "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). The rule provides that one way of satisfying the authenticity requirement is through "testimony of a witness with knowledge," *i.e.*, testimony that an item is what it is claimed to be. *Id.* at (b)(1). This Court has held that "[p]hysical evidence may be properly admitted despite gaps in testimony regarding custody." *Commonwealth v. Soto*, 202 A.3d 80, 102 (Pa. Super. 2018)

- 15 -

(citing *Commonwealth v. Witmayer*, 144 A.3d 939, 950 (Pa. Super. 2016), *appeal denied*, 169 A.3d 27 (Pa. 2017)). Further, "any issue regarding gaps in the chain of custody relate to the weight of the evidence, not its admissibility." *Id.*

Here, the trial court addressed Appellant's claim as follows:

[T]estimony from Philadelphia Police Detective Michael Repici established the authenticity of the video evidence at issue. Detective Repici testified that he went to Club 151 on June 9, 2022, at 10:45 p.m., downloaded the video from Club 151's DVR system for the time period of June 4, 2022 between 3:38 a.m. and 3:50 a.m. onto a flash drive, took it back to police headquarters, and gave it to the assigned investigator on the case, Detective Babb. Detective Repici further testified that he filled out a video recovery form for Club 151, which noted the assigned detective, who recovered the video, the time of the video versus real time, the location, and incident numbers.

Detective Repici testified similarly regarding the video recovery process from Beer Park. Specifically, Detective Repici testified that he went to the physical location, downloaded the video from Beer Park's surveillance cameras onto a flash drive, brought the flash drive back to headquarters, and handed it to Detective Babb. While Detective Repici could not locate the video recovery form for Beer Park prior to trial, he testified that he recovered video from Beer Park within a couple of days of the shooting and did so in the presence of Detective Rocks. Because Detective Repici testified to recovering the video footage from Club 151 and Beer Park, and then handing the videos to the assigned investigator on the case on a flash drive, the Commonwealth established sufficient chain of custody for the raw video clips that were included in the video compilation. The absence of the video recovery form for Beer Park went to the weight of the evidence, not its admissibility. No relief is due.

Trial Ct. Op., 12/5/24, at 11-12 (citations omitted).

Following our review, we agree with the trial court that Detective Repici's testimony was sufficient to authenticate the raw video footage at issue. At trial, Detective Repici testified regarding how and when he obtained the raw video footage. *See* N.T., 9/4/24, at 47-60. Specifically, Detective Repici explained that he downloaded the video recovered from Club 151 directly from the club's DVR system and exported it onto a flash drive, which he later turned over to the assigned detective on the case, Detective Babb. *See id.* at 53-59. Detective Repici also stated that he utilized a "video recovery sheet," upon which he noted there was a time offset between the camera system's time and Detective Repici's "real time." *Id.* at 47-48. Detective Repici testified that he was sure that the footage was in Detective Babb's custody when he parted with it, despite the lack of documentation of receipt. *Id.* at 56.

Detective Repici testified that he followed a similar process when recovering the beer distributor's raw footage. *See id.* at 49. However, Detective Repici indicated that while he usually prepares a "video recovery form" when collecting video footage, he was unable to locate the recovery form associated with the beer distributor footage. *Id.* at 57-60. Despite the missing recovery form, Detective Repici testified that he recovered the footage directly from the beer distributor's DVR system and that he subsequently delivered the footage to Detective Babb back at Police headquarters. *See id.* at 49.

Since Detective Repici testified that he collected the video footage, described how he collected it, and indicated that he delivered it to another detective at police headquarters, his testimony was sufficient to establish that the evidence was what the Commonwealth claimed that it was. **See** Pa.R.E. 901. Accordingly, Detective Repici's testimony was sufficient to authenticate the raw clips that were compiled into the video compilation shown at trial. To the extent there are any gaps in the chain of custody, such as the lack of a video recovery form, we agree with the trial court that such issue would go to the weight to be given to the video footage as evidence, not its admissibility. **See Soto**, 202 A.3d at 102. Accordingly, no relief is due. For these reasons, we affirm.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/25/2026